201 So.2d 314 (1967)
Mrs. Ethel Irene LEONARD, wife of/and Frank W. MANNING
v.
HERRIN TRANSPORTATION COMPANY, Theodore E. Guerin, Rex General Contractors, Inc. and Walter R. Chevalier.
No. 2611.
Court of Appeal of Louisiana, Fourth Circuit.
July 5, 1967.
*315 John E. Jackson, New Orleans, for plaintiffs-appellees.
Christovich & Kearney, W. K. Christovich, New Orleans, for defendants-appellants.
Before McBRIDE, SAMUEL and HALL, JJ.
SAMUEL, Judge.
This is a suit for personal injuries and other damages resulting from a rear end collision involving an automobile and two trucks. Plaintiffs are husband and wife. The husband sues for special damages; the wife seeks damages for her personal injuries. Defendants are the drivers of the two trucks, Theodore E. Guerin and Walter R. Chevalier, and their respective corporate employers, Herrin Transportation Co. and Rex General Contractors, Inc.
The accident occurred during the morning of May 21, 1965. The plaintiff vehicle driven by Mrs. Manning was stopped in obedience to a red traffic light. Just behind her car was the Rex vehicle, a pickup truck, which also was stopped for the light. The Herrin tractor truck ran into the rear of the pickup truck. That impact pushed the pickup truck into the rear of the plaintiff car.
Plaintiffs' suit against Rex and Chevalier was dismissed by summary judgment. After trial on the merits of plaintiffs' claims against Herrin and Guerin on November 14 and 15, 1966, there was judgment against those defendants, in solido, in favor of Mr. Manning in the amount of $1,686.28, and in favor of Mrs. Manning in the amount of $15,000. Herrin and Guerin have appealed.
The appeal is limited to the following defense contentions: (1) the award to Mrs. Manning for her personal injuries is grossly excessive; and (2) a portion of the award to Mr. Manning, for additional household help, is not justified by the evidence and should be disallowed.
Mrs. Manning has answered the appeal seeking an increase in her award from $15,000 to $30,000. In that answer Mrs. Manning states she continues to be in severe pain as a result of the injuries incurred by her in the accident and had been hospitalized for six days, from January 7 to January 13, 1967, with added complications resulting from those injuries. But she does not ask for a remand; and as the alleged continued pain, hospitalization and complications occurred subsequent to the time of trial and form no part of the record, we cannot consider those allegations. We must decide the case only on the record.
Testimony pertinent to the issues before us was given by the plaintiffs and seven medical experts, three of whom, Drs. Dugas, Brent and Haindel, testified on behalf of plaintiffs and four of whom, Drs. Lewis, Levy, Burkett and Cahen, were called by the defendants.
Mrs. Manning testified as follows: When the impact occurred she was thrown against and over the steering wheel. She was upset and incoherent and went into a nearby building for help. Her husband and a secretary from the office where she was employed came for her and took her first to the office and then to a hospital where they were met by Dr. Joseph E. Dugas, Jr. She was examined, x-rayed, put in traction and given medication. She was unable to tolerate some of the drugs and, although she was given diathermy on one or two occasions, it aggravated her condition. After her discharge from the *316 hospital she was treated by Drs. Dugas, Walter H. Brent, Jr. and Christian J. Haindel. Since her discharge she has endured pain in the neck, shoulders, lower back and ear, and sometimes experiences difficulty in walking. This pain was extreme for many months and has continued to persist to the time of trial, eighteen months after the date of the accident. She was advised to wear a cervical collar but after some time was unable to do so because it aggravated the pain behind her ear. Even though she has tried a mattress board and sleeping with the collar on, she has had difficulty in sleeping because of pain in all positions and in different areas of her body. Mrs. Manning is a housewife and secretary. She also does public relations work in connection with her job. Although she has received her salary regularly, other than two and one-half weeks during December of 1965 she has been unable to return to the office since the accident and does her work from her home. That work has consisted not only of typing but also of some speaking and social engagements and several trips to San Antonio, Washington, and other cities. At the time of trial she complained particularly of pain in the neck, shoulder and at the base of the spine, and earaches after periods of two days of typing. If she prorates her work over a period of a week she has pain at the end of the week. Continuous pain in the chest lasted several months and she still has occasional chest pain which she first felt after striking the steering wheel. While her neck has shown gradual improvement, on occasions she feels fine and the next day horrible with an intense earache which would last 4 to 7 days. If she aggravates her shoulders she still gets the earache and she still has back and neck pain. However, at this time if she carefully limits herself she is able to avoid most of the pain and discomfort.
Mr. Manning testified: After her return from the hospital his wife was in terrific pain for months. She could hardly sleep because of the pain. Even now, although she uses a special couch in order to get her neck in a more confortable position, she has trouble sleeping. She is still unable to perform her usual activities and her work has been extremely limited in the household and elsewhere.
Dr. Joseph E. Dugas, Jr., a general surgeon, saw plaintiff in the emergency room at Hotel Dieu shortly after the accident. She complained of pain in her neck and chest, the latter apparently caused by striking the steering wheel. Examination revealed limitation of motion with tenderness and spasm of the musculature. He diagnosed her principal injury as a sprain of the cervical spine. After admitting her to the hospital he treated her throughout her hospital stay (from May 21, to May 30, 1965) and for some time thereafter as an outpatient. He referred her to Dr. Walter H. Brent, Jr., an orthopedic specialist, for consultation and treatment of the cervical sprain. Mrs. Manning continues to be under Dr. Dugas' care. Although regular office visits were discontinued after seven months because she was no longer receiving any benefit from treatment, she still calls him for advice and relief of her troubles which reoccur. During hospitalization Mrs. Manning had severe pain. She was placed on analgesics and muscle relaxants. She had a very poor tolerance for drugs. Codeine made her sick, and she was allergic to demerol. Muscle relaxants didn't agree with her. Initially diathermy aggravated the neck pain. She did receive mild sedatives and tranquilizers and she was placed in intermittent cervical traction at the hospital and then discharged to outpatient care, continuing the tranquilizers and mild analgesics. Mrs. Manning finally managed to tolerate robaxin, a muscle relaxant, and eventually diathermy helped somewhat. She had quite a bit of pain in the right ear, so Dr. Dugas referred her to Dr. Christian J. Haindel, an ear, nose and throat specialist, for that condition. Dr. Dugas felt the ear trouble probably was related to the neck injury. In addition to the chest injury there was a contusion of the chest. Plaintiff's symptoms were sprains of the muscular *317 ligamentous structure of the neck with injury to the nerves manifested by pain in the region of the lesser occipital nerves which gave her pain in the right side and limitation of motion and spasm.
Dr. Dugas saw plaintiff almost continuously from May to December, 1965. Periodically Mrs. Manning has called him complaining of pain in the neck and he frequently suggested resumption of mild analgesics and muscle relaxants. Because typing requires the use of the arms and shoulders and puts a strain on these muscles, he was of the opinion that the performance of her work aggravated the condition. The doctor stated that during the first few weeks after the accident Mrs. Manning was emotionally upset and had a great deal of apprehension and tension. Plaintiff still had objective findings when last seen by Dr. Dugas on October 28, 1965. At that time she still had some tightness in the musculature in the right side of the neck and complained of pain in the neck and ear. He is of the opinion she is still handicapped to some degree at this time whenever she does sustained strenuous activities. He advised continued treatment, mild analgesics, use of local moist heat, hot soaks, and avoidance of strenuous physical activities. In view of his objective physical findings indicating to him a permanent residual disability in her neck, it is his further opinion that her symptoms will be permanent.
This doctor said there is no known cure for her problem. He believes her symptoms are related to the scarring and the damage to the muscles and ligaments and nerves in her neck. There is no way to remove the scar tissue or the damage to the ligaments and muscles in order to give plaintiff relief from her symptoms. He feels that plaintiff's injury was so severe she has had too much scarring to have complete recovery and will continue to have some permanent pain.
Dr. Walter H. Brent, Jr., an orthopedic surgeon, first saw Mrs. Manning at the request of Dr. Dugas on June 2, 1965. At that time he gave her a thorough medical examination. She had extreme spasm of the muscle structure controlling the cervical spine, tenderness over the entire cervical area, and marked limitation to all motion of the neck. She had a complete range of shoulder and shoulder girdle motion. Her complaints were of pain in the neck and low back. This doctor found the following restrictions: flexion limited when fingers come within 18" of the floor; lumbar lordatic curve restricted with forward bending; straight leg raising 70° (normally 90°); could not assume a knee-chest position because of acute pain in the low back area; tenderness on the anterior rib cage. The remainder of his findings were normal. He diagnosed patient's injuries as acute cervical sprain, acute low back sprain, and contusion of the right anterior rib cage and sternum.
Dr. Brent gave plaintiff additional medication, fitted her with a cervical collar and a girdle to support the back area and advised her to return for diathermy and cervical stretch treatment at regular intervals. Around June 22 she developed ear complications and thereafter discontinued diathermy and stretch treatments because it increased the pain in that area. She was last seen by this doctor on August 8, 1966 for an injury unconnected with the accident. At that time she still had discomfort in the neck although most objective signs had subsided. In his opinion her complaints of dizziness, severe headaches and earaches were attributable to the injuries in the instant accident. From an orthopedic standpoint he did not consider the injuries were permanent although she had a very severe neck injury and stayed in spasm much longer than the ordinary case. He feels her symptoms should gradually completely disappear in an additional year. She was seen by him on 24 occasions for treatment.
Dr. Christian J. Haindel, an otolaryngologist, specializes in diseases of the ear, nose and throat. He first saw plaintiff *318 on June 17, 1965, at which time she complained of an ache and a ringing in the right ear and dizziness. Visual examination of the ear was normal. She returned on July 2. At that time she had right otitis media, a middle ear infection, and a slight sore throat. She had no previous history of any type of ear condition before the whiplash. He treated her with aromisen antihistamine. He saw her again on July 6, 8, and 18, 1965, at which time the eardrum was normal. She was still complaining of pain and dizziness. He made various tests. On July 30, 1965 the hearing test showed a definite loss of hearing in the right ear of 20 decibels. This is approximately 7%. The hearing test was repeated on October 26 and there was a marked reduction in the right ear down to 25 decibels. He sent her to L.S.U. for further hearing tests. He reviewed their findings which indicated the hearing was normal, but in a room with loud noises she had a moderate or minimal loss.
When asked if the accident attributed to the ear condition the doctor stated it was hard to say. Although Mrs. Manning told him she had never had earache before, he couldn't say it was not due to the injury and he could not say it was. In adults, middle ear infections are infrequent or never. The infection might have been caused by an injury to the eustachian tube as it travels to the pharynx. In his opinion Mrs. Manning's ear problem appears to be permanent. She was last seen by this doctor on October 2, 1965.
On cross examination Dr. Haindel stated plaintiff came in with a cold on the first visit. The second time she came in she had a cold and a middle ear infection and he went on with further testing. On the third or fourth visit she returned because of severe pain in the right ear which he assumed was due to an injury to the nerves that supplied the muscles in this area, not due to the ear, but when he tested her hearing on one of those visits he became alarmed and went on with further testing.
Dr. Miles Lewis, an otologist, saw Mrs. Manning on June 9, 1966. He took her history and performed an ear, nose and throat examination. He did routine hearing tests consisting of pure tone and speech tests to determine hearing acuity. Her ear examination was entirely within normal limits. She showed no evidence of previous injury, scarring or abcesses. Pure tone audiometry revealed absolutely perfect hearing in both ears. He concluded the pain of which she complained was not related to her ears, nose or throat in any way.
The court questioned the doctor as to the cause of her complaints. In answer Dr. Lewis stated deferred pain to the ear is not an uncommon symptom. Frequently a patient is really having pain behind the ear, in the neck or over the mastoid process and this could be due to any number of causes. His impression from the injury plaintiff described to him was that possibly the pain was caused by some neck injury but this was outside of his field and he was not competent to judge whether it was or not. He had not examined her from that standpoint; his examination was limited to her ability to hear normally and to determine whether there was any local cause, particularly infection, for her ear pain. As far as the pain itself he did not go into anything beyond the ear to determine the cause. Dr. Lewis testified that, if plaintiff had seen an ear, nose and throat specialist on June 17, 1965 and the examination was normal but when again seen on July 2 the specialist made a diagnosis of otitis media, he would not connect such infection with trauma which had occurred on May 21; he would assume it was something which had developed between examinations. He stated the general cause of otitis media is from complications of another respiratory infection. The doctor found no objective evidence of any abnormality with respect to Mrs. Manning's ears or hearing. He was of the opinion the "ear" pain of which plaintiff complained was not related to the ear, nose or throat in any way.
*319 Dr. Richard W. Levy, a neurologist, saw Mrs. Manning on December 20, 1965 at which time he took her history and performed a neurological examination. She complained of pain in the side of her neck going into the base of the skull, which she said was not quite as intense as it once was, pain in both shoulders and pain in the right ear. Prolonged sitting hurt her tail bone; she noted numbness and tingling in both hands and arms. The latter disappeared after 1 or 2 hours following arising. She had a cervical collar but told him she did not wear it.
The neurological examination was normal. He found slight restriction of motion when she attempted to put her chin toward her chest, look upwards and turn her head to either side. He could find no neurological explanation for this. She complained of generalized soreness when he pressed his thumb over each of the cervical vertebrae.
Dr. Levy found no evidence of injury or disease of the spinal cord or nerve roots and he had no neurological recommendations. He stated that if a patient complains of pain in the ear it is possible this can occur as a result of trauma to the spinal cord or nerve trauma, inasmuch as the second and third cervical nerve roots supply the skin immediately behind the ear and also a part of the pinna or floppy part of the ear. Therefore an injury to the nerve roots could result in a complaint of pain behind the ear and the scalp or in the pinna. He did not find objective evidence of any kind to indicate the possibility of damage to the cervical nerve roots.
Dr. George Burkett, an orthopedic surgeon, examined Mrs. Manning on July 18, 1965, a month after the accident. He found marked limitation of motion of the cervical spine. Forward bending and extension were limited by pain in the cervical region to the right of the midline, rotation to the right being limited to a greater degree than to the left. Lateral bending to the right produced pain in the right ear, to the left it produced pain on the right side of the neck. Slight pressure on palpation for areas of tenderness produced excruciating pain over the whole cervical spine and right trapezius muscle. X-rays indicated excellent cervical lordosis without evidence of fracture or dislocation.
Based upon the history, examination and x-rays, this doctor concluded that as a result of the accident plaintiff had symptoms referable to her chest, right side of her neck and right shoulder as well as headaches. His experience indicated individuals with injuries of this type continue to have symptoms for a period of time after all objective findings have subsided and he anticipated plaintiff would recover without residual disability. He could not say when her symptoms would subside stating it depended on the individual or the treatment they receive.
Dr. Irvin Cahen, an orthopedic surgeon, saw plaintiff on July 19, 1966. At the time of his examination she complained of discomfort when the musculature in the back of the shoulder girdles was compressed, more to the right side than the left. His examination from an orthopedic standpoint revealed no abnormalities. Based upon that examination, her history and x-rays, the doctor assumed the initial trauma involved a sprain of ligaments of the cervical vertebral level with its adjacent juncture to the shoulder girdle. Her complaints relative to the eyes (she complained to this doctor of some blurring of vision) and ears were those associated with injuries of this type but he did not proceed with additional examinations pertaining to those senses because they would be associated with other specialists. He did not feel she required additional orthopedic care and was of the opinion she could function normally in her secretarial capacity. He found no residuals on an objective basis from the standpoint of his orthopedic examination and subjectively he did not find her complaints acute. He found no orthopedic explanation for her subjective complaints.
*320 In order to determine whether the award of $15,000 for the injuries sustained by Mrs. Manning is either excessive or inadequate to the extent that it constitutes an abuse of the "much discretion" given to the trial court by LSA-C.C. Art. 1934(3), we have examined other Louisiana appellate cases involving somewhat similar injuries. See Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64, and Ballanga v. Hymel, 247 La. 934, 175 So.2d 274.
Our research reveals that in the absence of some permanent disability resulting from her injuries the $15,000 award is so excessive as to constitute an abuse of discretion. See Mouton v. Continental Ins. Co., La.App., 196 So.2d 684; Barrere v. Commercial Union Insurance Group, La. App., 195 So.2d 461; Williams v. Bologna Bros., Inc., La.App., 194 So.2d 131; Paine v. Netherton Company, La.App., 191 So.2d 686; Evers v. State Farm Mutual Automobile Ins. Co., La.App., 187 So.2d 217; Luquette v. Bouillion, La.App., 184 So. 2d 766; Mathews v. Employers Mutual Fire Ins. Co. of Wis., La.App., 180 So.2d 38; Poleman v. Employers Liability Assurance Corp., La.App., 164 So.2d 630; Carvell v. Winn, La.App., 154 So.2d 788; St. Blanc v. Andras, La.App., 148 So.2d 850; Self v. Johnson, La.App., 124 So.2d 324.
We are unable to hold that Mrs. Manning suffers any permanent disability in either of the only two possible areas of such disability, the neck and the ear.
Only Dr. Dugas, who offered no opinion as to the ear itself since that was not in his field, testified the neck injury would result in some permanent pain. All of the other physicians who testified relative to Mrs. Manning's injuries, other than that to the ear itself, were of the opinion there was no permanent residual; all of them felt the symptoms would gradually disappear. Those doctors Brent, Levy, Burkett and Cahen, were specialists in the field involved; Dr. Dugas was not such a specialist; and Dr. Brent was a treating physician as was Dr. Dugas. The testimony of a medical specialist in the field of his specialty is entitled to greater weight than that of a physician not so qualified. Gernon v. Buchanan, La.App., 201 So.2d 208, handed down this date; Williams v. North American Insurance Co., La.App., 169 So. 2d 586; Harrell v. Southern Pulpwood Insurance Company, La.App., 155 So.2d 281; Taylor v. Hawkins, La.App., 153 So.2d 192.
Only two physicians, Drs. Haindel and Lewis, testified relative to the question of permanent ear injury. Both are specialists in that field. Dr. Haindel was of the opinion that Mrs. Manning had an ear problem, a middle ear or space infection (otitis media), which appeared to be permanent. But he testified he could not say the problem was or was not caused by the injuries she sustained in the accident. Our reading of his testimony alone leaves us in serious doubt as to whether the injuries could have caused the problem. On the other hand the testimony of Dr. Lewis is unequivocal. He was of the opinion the infection Dr. Haindel had diagnosed was unconnected with trauma and at the time of his examination, made almost a year after Dr. Haindel's last examination, he found nothing wrong with Mrs. Manning's ears. In tort, as in other cases, the plaintiff bears the burden of proving his claim to a legal certainty, including the fact that the injuries for which he seeks recovery were caused by the tort; mere possibilities are insufficient to support a judgment in his favor. Martin v. Westchester Fire Insurance Company, La.App., 183 So.2d 769; Ball v. Marquette Casualty Company., La. App., 176 So.2d 799; Roberts v. M. S. Carroll Co., La.App., 68 So.2d 689.
We find that Mrs. Manning incurred a severe acute cervical sprain, an acute low back sprain, and a contusion of the right anterior rib cage and sternum. Those injuries resulted in severe pain and suffering including, among other things, dizziness *321 and frequent severe headaches and earaches, over a period of approximately five months. All of that suffering is attributable to the accident and continued for a much longer period of time than it ordinarily does in the usual case with similar injuries. She still had occasional pain, was restricted in her activities, and found it necessary to use a special couch for sleeping purposes to the date of trial approximately eighteen months after the accident. It is true, as defendants argue, she discontinued regular office visits to her doctors about seven months after the accident; but she did so on the advice of Dr. Dugas because she was no longer receiving any benefit from treatment. In addition, and we consider this important, because of her inability to tolerate the usual pain relieving drugs, she suffered much more than would otherwise be the case. We are of the opinion she is entitled to an award of $10,000.
We do not agree with defendants' second contention, that the award for additional household help should be disallowed. The award complained of is in the total amount of $585. It represents the salary of an extra maid at the rate of $32.50 per week for a period of eighteen weeks. Several of their children lived with the Mannings and prior to the accident they regularly employed one maid to help with the household work. It suffices to say the record, particularly the testimony of the two plaintiffs and of Dr. Dugas, establishes to our satisfaction, as it did to the satisfaction of the trial judge, that Mrs. Manning's injuries and resultant incapacity necessitated employment of the additional maid at the salary and for the time covered by the award.
For the reasons assigned, the judgment appealed from is amended only to the extent of reducing the award in favor of Mrs. Ethel Irene Leonard, wife of Frank W. Manning, from the sum of $15,000 to the sum of $10,000. As thus amended, and in all other respects, the judgment appealed from is affirmed; costs of this appeal to be paid by the appellees.
Amended and affirmed.